# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ROSITA CHATONDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 23 C 402 |
| | ) | |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Rosita Chatonda has sued her former employer, the Board of Education of the City of Chicago, for discrimination and retaliation following her discovery that she had been placed on the "Do Not Hire" (DNH) list back in 2010. Specifically, Chatonda alleges that the Board designated her as DNH due to her race and in retaliation for a prior complaint about discrimination, in violation of Title VII of the Civil Rights Act of 1964 for race discrimination, 42 U.S.C. §§ 2000e-2(a)(1) & 2000e-3(a),[1] and that the DNH designation deprived her of her right to occupational liberty under the Fourteenth Amendment's Due Process Clause, a claim she asserts under 42 U.S.C. § 1983.

The Board has moved for summary judgment on all of Chatonda's claims. For the reasons set forth below, the Court grants the Board's motion.

---

[1] The Court thanks attorneys Catherine Chapman and Destiny Collins of Baum Sigman Auerbach & Neuman, Ltd., for their thorough and diligent work as appointed counsel for Ms. Chatonda.

**Background**

The following facts are not in dispute, unless otherwise indicated.

Rosita Chatonda is a former Board of Education employee. Chatonda began working as a teacher for the Board in September 1985 and continued her employment until June 2010. Her first position was as a provisional substitute teacher, a position she held until she became a regular teacher in September 1996. At the time of her termination in 2010, Chatonda was a tenured teacher and member of the Chicago Teachers Union (CTU). As such, she was subject to the Collective Bargaining Agreement between the Board and CTU, as well as the disciplinary procedures as laid out in the Board's Employee Discipline and Due Process Policy.

In March 2007, Chatonda began teaching at James Madison Elementary School. She was transferred to Joseph Jungman Elementary School in September 2007 and taught there for one semester. In January 2008, Chatonda was transferred again, to Edward H. White Elementary School. The Board contends that these transfers were due to allegations regarding Chatonda's inappropriate conduct towards students, which according to the Board included calling students demeaning names, using unapproved punishments like placing a student in a closet, and, in one instance, pinching a student on the cheek. The Board contends that this conduct occurred throughout the 2007–2008 and 2008–2009 school years. The Board conducted several investigations into Chatonda's conduct during this period.

In August 2007, prior to this series of transfers, Chatonda had written to Xavier Botana, the Chief Officer of Instructional Design and Assessment at Chicago Public Schools (CPS), alleging that Lorraine Wilson, principal of James Madison Elementary,

2

and Dr. Eason Watkins, the Area Coach, had improperly promoted several "unendorsed" teachers as Math and Science Lead Teachers for the 2007–2008 school year.  Def.'s Resp. to Pl.'s SOF ¶ 4.  Chatonda contends that Botana investigated the accusation, found it credible, and that in retaliation the Board transferred her to Jungman Elementary.  In October 2007, following her transfer to Jungman Elementary, Chatonda filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging age discrimination, harassment, and retaliation.  *See* Second Am. Compl., Ex. B.

In early 2009, the Board initiated dismissal proceedings against Chatonda.  She was suspended without pay in April 2009, and in November and December of that year dismissal proceedings were held before Illinois State Board of Education (ISBE) Hearing Officer Robert Perkovich.  Hearing Officer Perkovich found that several of the allegations against Chatonda were credible and concluded that her conduct caused damage to the students in her classroom, thereby constituting irremediable *per se* misconduct warranting dismissal.  *See* Pl.'s Resp. to Def.'s SOF ¶¶ 32–33.[2]

In June 2010, the Board adopted Hearing Officer Perkovich's findings and approved his recommendation to terminate Chatonda.  Chatonda was subsequently terminated for cause, and a DNH designation was placed in her internal personnel file with an effective date of June 23, 2010.  *See id.* ¶ 38.  The policy for DNH designations is set forth in the "Chief Executive Officer's Guidelines for Designating Separated Employees as Ineligible for Rehire."  *See* Def.'s SOF, Ex. 18.  This policy, effective July

---

[2] Chatonda objects to these statements of fact on the ground that they are irrelevant to whether the Board discriminated against her due to her race, but she does not deny their accuracy.

1, 2011,[3] states that "[t]he District changed its guidelines for designating certain separated employees . . . as ineligible for rehire ('DNH') in May 2010" and that "[t]hese Guidelines memorialize and amend those guidelines." *Id.*, Ex. 18 at 1. It states that "the following separated employees *shall* be designated as ineligible for rehire." *Id.* (emphasis added). Such separated employees include, in part, "[e]mployees dismissed for cause," "[e]mployees who engaged in misconduct," and "[e]mployees who separated while an investigation was pending and that investigation ultimately substantiated serious misconduct by the employee." *Id.* The language of the policy indicates, by its use of the word "shall," that a DNH designation for employees terminated for the above listed reasons is mandatory, not discretionary.

The Court notes that although the written policy was not issued until July 2011, it indicates that the policy had been instituted in May 2010. In addition, James Ciesil, general counsel for the Board, attests via a signed declaration that "[p]rior to the 2011 DNH guidelines, the Board used internal guidelines to help inform on when a DNH would be placed in a separated employee's personnel file." Ciesil Decl. ¶ 5. Ciesil states that "[t]hese guidelines were not shared with anyone outside the Board and instead was [sic] an attorney-client document housed within the Board's Law Department." *Id.* He "do[es] not recall whether the guidelines were written down" prior to 2011. *Id.* Ciesil further attests:

Before the 2011 guidelines were implemented, the Board placed DNH

---

[3] Chatonda challenges the relevance of these guidelines but does not dispute their accuracy. She points out that the policy is effective July 1, 2011—after she was terminated. In other words, these written guidelines were not in effect when she received her DNH designation, and therefore they have no bearing on the Board's decision to designate her as DNH. The Court makes note of the dispute here and will address this argument in the relevant section of this opinion.

designations on the personnel files of: (1) employees dismissed for cause, including, but not limited to, employees who engaged in misconduct, employees who were incompetent in their job performance; (2) employees who voluntarily resign while dismissal charges or actions are pending or in lieu of dismissal; and (3) employees who separated from employment while an investigation was pending if that investigation substantiated misconduct.

*Id.* ¶ 6. According to Ciesil, before the 2011 written guidelines went into effect, "after an employee was terminated for cause, or for other reasons warranting a DNH, it was my routine practice to send an email to the Board's Human Resources Department." *Id.* ¶ 7. Ciesil states that Chatonda was "ultimately terminated for cause in June of 2010" and that he emailed the Board's HR department following this termination to ensure that Chatonda was designated as DNH. *Id.* ¶¶ 10, 12–13. Ciesil further states that "[a]s a result of this email, the Board's Human Resources Department placed a DNH designation on Rosita Chatonda." *Id.* ¶ 14.

In response to her termination, Chatonda filed a complaint for administrative review in the Circuit Court of Cook County in July 2010. The circuit court affirmed the Board's termination decision in October 2011. In doing so, the state court applied the "Administrative Review Law," under which "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct" and "rulings on questions of fact will be reversed only if against the manifest weight of the evidence." Def.'s SOF, Ex. 33 at 5. The state court concluded that "[t]he Chicago Board has demonstrated that the record supports the Hearing Officer's finding on the first prong of the [irremediable conduct] analysis that plaintiff's conduct caused damage or harm to the students." *Id.*, Ex. 33 at 11. The state court based this finding on "testimony and/or evidentiary inferences that the plaintiff engaged in name calling and used profanity; and that students became upset after such incidents." *Id.* The court

further concluded that "it was not against the manifest weight of the evidence or clearly erroneous for the Hearing Officer to find that plaintiff would not have corrected her conduct if she had been warned." *Id.* Based on this, the state court concluded that Chatonda "has not shown that the record lacks any support for the Chicago Board's finding that [she] engaged in specific conduct that is described in the Amended Complaint." *Id.*, Ex. 33 at 12. The state court also concluded that Chatonda "failed to demonstrate that the Chicago Board's finding that her conduct was irremediable *per se* was against the manifest weight of the evidence or clearly erroneous under the arguments she has made, the authority referred to or the citations to the record in her submissions." *Id.* The state court accordingly denied Chatonda's complaint for administrative review and sustained the Board's order of termination. *Id.*, Ex. 33 at 13.

Chatonda then spent the next few years working in the field of education, but she did not return to classroom teaching until 2013. In October of that year, she began teaching first grade at McNeal Elementary School in Canton, Mississippi. Her contract was not renewed following the 2013–2014 school year, however. In August 2015, Chatonda began teaching sixth through eighth grade science at St. John De LaSalle High School, a private Catholic high school in Chicago. Chatonda was terminated from this position in June 2016.

In August 2021, Chatonda submitted a petition to the Board requesting removal of her DNH designation, which the Board denied. In November of that year, Chatonda interviewed for a teaching position at Epic Academy Charter High School. Following this interview, she signed an authorization permitting the Board to conduct a background check and release information to Epic Academy regarding any disciplinary

or dismissal actions taken against her.  As a result of this background check, Epic Academy learned of Chatonda's DNH designation and declined to offer her the position.

Chatonda filed her lawsuit *pro se* in December 2022.  Due to various formatting or technical issues, the initial complaint was not filed on the docket until January 2023. The Court later appointed counsel to represent Chatonda.  The Board now seeks summary judgment on all of Chatonda's claims.

### Discussion

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists when, after drawing all reasonable inferences from the record in favor of the nonmoving party, a reasonable trier of fact could return a verdict for the nonmovant.  *Id.*

The party seeking summary judgment bears the initial burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has met this burden, the "party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact." *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).  If the party with the burden of proof cannot show that its claim or defense is factually supported, summary judgment against that party is appropriate.  *Celotex*, 477 U.S. at 323–24.

A.      **Title VII claims (Counts 2 & 3)[4]**

Chatonda asserts both a discrimination claim (count 2) and a retaliation claim (count 3) under Title VII against the Board based on her DNH designation.  The Court will address each in turn.

To begin with, Chatonda's claim in this case is confined to claims that the DNH designation—not the underlying termination—was discriminatory or otherwise improper.  And there is a good reason for this:  Chatonda is barred by the doctrine of claim preclusion from asserting discrimination or retaliation claims regarding the underlying termination.  Specifically, the Court must give preclusive effect to the state court's ruling that the Board's termination of Chatonda was lawful, even though she did not assert a race discrimination claim, as such, in that lawsuit.  *See Walczak v. Chi. Bd. of Educ.*, 739 F.3d 1013, 1017 (7th Cir. 2014) ("We have held that Illinois litigants seeking circuit-court review of administrative proceedings implicating events that also give rise to a federal civil-rights claim must join that claim with the judicial-review action in the circuit court.").  "Claim preclusion applies not only to matters that were actually decided in the original action but also to matters that could have been decided."  *Id.* at 1017. Chatonda could have brought a federal discrimination claim alongside her claim for review of the administrative proceedings, but she did not do so.  The doctrine of claim preclusion prevents her from challenging the termination here.  Accordingly, the only

---

[4] The Board initially argued that it was entitled to summary judgment on Chatonda's Title VII claims because they are untimely.  In its reply, however, the Board acknowledges Chatonda raises triable issues of fact regarding the timing of her initiation of the present action.  Based on this, the Board no longer contends that the timeliness issue can be decided on summary judgment.  Accordingly, the Court makes no finding on whether Chatonda's Title VII claims are timely.

adverse action that may support her discrimination and retaliation claims is her designation as DNH—which is the way that Chatonda has pleaded her claims in the operative version of her complaint.

### 1. Discrimination under Title VII (Count 2)

Title VII of the Civil Rights Act of 1964, in pertinent part, makes it unlawful for an employer "to fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

In assessing whether a plaintiff can establish a claim of discrimination, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In other words, the question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.*

Chatonda points to what she characterizes circumstantial evidence of discriminatory intent, specifically that the Board's investigation into her alleged misconduct contained numerous flaws. *See* Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 11–12. Chatonda also offers statistical evidence that the Board terminated more Black teachers than non-Black teachers and disciplined Black teachers more harshly than non-Black teachers. *See id.* at 13–15. This appears to the Court as an argument that circumstantial evidence supports an inference that discriminatory animus

drove the Board's decision to designate Chatonda as DNH.

Proof of discriminatory animus may be made via "circumstantial evidence that would permit the trier of fact to infer that discrimination motivated the adverse action." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). "Typical" circumstantial evidence that would permit such an inference includes "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 995–96 (citation and quotation marks omitted). Summary judgment is inappropriate "[i]f the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action . . . ." *Id.* at 996.

The Court concludes that Chatonda cannot establish race-based discrimination and that no reasonable fact-finder could find otherwise. As indicated, Chatonda contends that circumstantial evidence supports an inference that her DNH designation was motivated by discriminatory animus. First, she argues that she was an effective employee for over twenty years and that "[i]t was not until she reported some of Defendant's employees' biased promotional practices that [she] became an allegedly problematic teacher." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 11. According to Chatonda, "a long favorable record suddenly blemished by alleged misconduct and then a termination" can support an inference of discriminatory animus. *Id.* She relies on *Vega v. Chicago Park District*, 954 F.3d 996 (7th Cir. 2020), to support this premise.

10

There, the Seventh Circuit found that a "jump straight to termination" was "in tension with [the plaintiff's] long, favorable record," and that this "was important evidence because significant, unexplained or systematic deviations from established policies or practices can be probative of discriminatory intent." *Vega*, 954 F.3d at 1004 (cleaned up) (citation and quotation marks omitted).

The Court finds Chatonda's application of *Vega* in this context unpersuasive. First, the court in *Vega* noted that the "jump straight to termination" was not only "in tension" with the plaintiff's favorable employment record—it also found that "it violated multiple union commitments." *Id.* Here, by contrast, the state court found that the Board's termination of Chatonda was lawful and that she had not shown that the Board and Hearing Officer Perkovich's findings were against the manifest weight of the evidence. *See* Def.'s SOF, Ex. 33 at 9. So the facts of this case are not as aligned with *Vega* as Chatonda contends. Second, and perhaps more importantly, the adverse action underpinning Chatonda's discrimination claim is her designation as DNH, not her termination. Thus what matters is whether *the decision to designate Chatonda as DNH* deviated in a significant or unexplained way from established policies and practices.

Chatonda contends that the DNH designation was superficial and that "there was no review of the decision to designate [her] as DNH." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 15. But this is notably different from the court's statement in *Vega* that deviations from established policies or practices can be significant evidence of race-based animus. The Board points to a written policy for DNH designations, but Chatonda points out that the written policy was not effective until after she received the DNH designation. On the other hand, the written policy notes that "[t]he District

changed its guidelines for designating certain separated employees" as DNH "in May 2010." Def.'s SOF, Ex. 18 at 1. Chatonda was designated DNH in June 2010. Ciesil stated that, at the time of Chatonda's DNH designation in 2010, "the Board used internal guidelines to help inform on when a DNH would be placed in a separated employee's personnel file." Ciesil Decl. ¶ 5. And he further testified that at that time, a recommendation for a DNH designation was automatic for teachers terminated for cause, as Chatonda was. In short, on the record before the Court, no reasonable finder of fact could say that Chatonda's designation as DNH deviated from any established policy or practice.

As further circumstantial evidence of discriminatory animus, Chatonda points to statistical evidence that she contends shows that similarly situated non-Black CPS teachers systematically received better treatment. First, Chatonda offers a press release written by the Chicago Teachers Union addressing the ISBE's 2010 School Report Card. *See* Pl.'s SOF, Ex. 48. In this press release, CTU notes data for 2010 shows that "50.6% of CPS teachers are White" and "29.6% of CPS teachers are African American." *Id.* at 1. The press release goes on to note that "a demographic analysis of the 75 percent of laid off teachers for whom data is available" reveals that "43% of laid off CPS teachers are African American" and "40% of laid off CPS teachers are White." *Id.* at 2. According to Chatonda, "statistics can be an important source of proof in employment discrimination cases," *Hazelwood School District v. United States*, 433 U.S. 299, 307 (1977), and "behavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference of discrimination," *Vega*, 954 F.3d at 1005 (citation and quotation marks omitted).

12

The Court is not persuaded that this statistical evidence supports a reasonable inference that the Board designated Chatonda as DNH due to discriminatory animus. These statistics relate to overall *hiring* and *termination* practices by the Board; they say nothing about *DNH designations*.  Again, the Court finds Chatonda's reliance on *Vega* misplaced.  In *Vega*, the plaintiff put forth statistical evidence that "no Caucasian park supervisors were fired between 2005 and 2012, while 17.6% of the Park District's Hispanic park supervisors were fired during that same period."  954 F.3d at 1005.  The plaintiff in *Vega* also had evidence that "[w]hile Vega was surveilled 252 times over the course of 56 days by two different investigators, a Caucasian park supervisor accused of a similar violation was surveilled only three times."  *Id.*  These statistics directly addressed the actions at issue in *Vega*; the statistics cited by Chatonda here do not.  Specifically, the termination statistics do not bear on whether resulting DNH designations were applied in a discriminatory manner.

Chatonda does point to statistics regarding employees designated as DNH during the 2009–2010 school year.  *See* Def.'s SOF, Ex. 57.  This list indicates that thirteen teachers, including Chatonda, were designated as DNH during that period.  The list also includes information about the teachers' race and ethnicity, as indicated by their personnel files.  *See id.*  But on this list, every teacher except one was designated as DNH.  The race of the teacher who was not designated DNH is—like Chatonda—Black.  In short, the list does not reasonably support a finding that anyone *outside* Chatonda's protected class was treated more favorably despite having the same or similar disciplinary violations as were alleged against Chatonda.

Chatonda points out that, of the thirteen teachers on this list, only four are not

Black and, of those, only two are white. This, she contends, gives rise to an inference that the Board must be treating non-Black teachers more favorably, given that the demographic of CPS teachers at the time was roughly fifty percent white. *See* Pl.'s SOF, Ex. 48. This is too large of a logical leap from the purely statistical comparison that Chatonda attempts to draw; it is not a *reasonable* inference. *See Downing v. Abbott Lab'ys*, 48 F.4th 793, 815 ("A plaintiff cannot make a prima facie case of adverse impact where the affected group is too small for any valid statistical comparisons, which immunizes most single decisions from disparate impact challenges." (cleaned up) (citation and quotation marks omitted)); *id.* at 816 (collecting cases); *cf. Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) ("A plaintiff who wants a court to infer discrimination from the employer's treatment of comparable cases has to analyze a goodly sample. One is an anecdote, and several cases are several anecdotes. Judges do not find discrimination on such a thin basis."). In *Downing*, the plaintiff relied on a sample size of ten individuals who applied for a director position. *Downing*, 48 F.4th at 815. Of those ten individuals, two were Black; those two applicants subsequently received "the lowest ratings of ten candidates for the position." *Id.* The plaintiff contended that this was "ample evidence that the subjective rating system [the defendant] used disparately impacted African-Americans." *Id.* The Seventh Circuit disagreed and affirmed the district court's grant of summary judgment based on the conclusion "that the sample size of 10 applications . . . was too small to be statistically meaningful." *Id.*

The Court finds that Chatonda has not made the case that the statistical evidence she cites would permit a reasonable inference of discriminatory animus. Put

differently, given the small sample size, the unbalanced proportion of white teachers employed by the Board compared to the number of white teachers receiving DNH designations does not indicate that the Board is designating more Black teachers as DNH based on race. And Chatonda provides no other evidence to bridge the statistical gap. For example, Chatonda offers no evidence regarding the reason why any of the other teachers on the list were designated as DNH. She offers no evidence that any DNH designation for a teacher on this list was improper. And she offers no evidence that any DNH designation for a listed teacher was later found to have been discriminatory for any reason, let alone due to race.

Finally, Chatonda contends that the Board's investigation into her alleged misconduct had numerous errors. In particular, Chatonda argues that the Board terminated her in part due to the alleged incident in which police were called after she pinched a child on the cheek. But according to Chatonda, "the police officer who investigated the incident found that the incident did not occur." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 11. She also claims that the principal at Jungman Elementary ignored her reports that students were using profane language and racial epithets towards her and instead requested she be transferred to a different school. She goes on to argue that, upon transferring to White Elementary, her "reputation had already been tainted by the Jungman principal's false claims of child abuse" and as a result she was targeted by the principal of White Elementary, who accused her "of verbally abusing the students." *Id.* at 12. She points to letters written by two of these students that she contends undermine these accusations of verbal abuse. Chatonda further argues that one of the letters "reveal[s] that the principal of Edward H. White

Academy was retaliating against [the student] for not reporting [Chatonda]." *Id*. Chatonda again relies on *Vega* for the premise that "flagrant inaccuracies and inconsistencies in the employer's supposed reason for firing the plaintiff can be evidence of pretext." 954 F.3d at 1005 (citation and quotation marks omitted).

The Court is not persuaded by Chatonda's arguments regarding claimed flaws in the investigation. Again, these arrows are aimed at the wrong target: Chatonda's claims challenge, and can *only* challenge, the DNH designation, not the termination itself. But before addressing them, the Court must again note that many of these arguments are precluded by the state court's findings. And that aside, the claimed flaws cited by Chatonda do not support her argument. For example, Chatonda contends that the police officer who investigated the pinching incident at Jungman Elementary "found that the incident did not occur." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 11. To be frank, the police report says no such thing. The report itself contains scant details of the incident; its narrative states that the reporting officer "was asked by victim of previous HN-753109 R.D. NO. UCR code 0460 to cancel above R.D. #, she stated school will handle her problem." Pl.'s SOF, Ex. 10. That is not a finding that there was no such incident. In addition, whether the principal at Jungman Elementary ignored her reports of students using profane and racist language toward her has no bearing on whether she engaged in the conduct that led to her termination.

Chatonda's arguments about the flawed investigation as it relates to her time at White Elementary fare no better. Her characterization of the student letters is at odds with the language in the letters. One of the student letters states that "Ms. Jenkins the principal of Edward H. White Academy, she is targeting me because I won't tell on Ms.

16

Chatonda.  If I don't she'll suspend me."  Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 12.  But the phrase "because I won't tell on Ms. Chatonda" could be read more than one way; one interpretation supports Chatonda's contention that the accusation is made up, but another reasonable interpretation is that Chatonda did do what she was accused of, but the student does not want to "tell" on her.  The other student letter can also be read two ways.  This letter states that "I never told Mrs. Jenkins that you called me a bitch or a hore [sic] so if I caused any problems I want you to know that I am so sorry and Mrs. Jenkins was using us to get information on what you were doing and what you wasn't."  *Id.*  Again, one interpretation is that Chatonda never called the student these names, but another reasonable interpretation is that she *did*, but the student claims not to have reported this language to the principal.

Though one might question, as an original matter, whether Chatonda engaged in all of the conduct alleged against her that led to her termination, this does not create a genuine dispute of *material* fact.  As the Court has explained, Chatonda may not litigate here whether her termination was proper; the issue involves whether the DNH designation that followed the termination was discriminatory.

In sum, Chatonda has not shown a genuine dispute of fact exists regarding her discrimination claim under Title VII.  Because no reasonable fact-finder could disagree, the Board is entitled to summary judgment in its favor on count 2.  The Court grants the Board's motion for summary judgment on this count.

### 2.    Retaliation under Title VII (Count 3)

Title VII protects employees against retaliation by employers for engaging in protected activity.  *See* 42 U.S.C. § 2000e-3(a).  Retaliation may be shown by either the

direct or indirect method of proof.  *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir.

2012).  Chatonda argues her case only under the direct method, so the Court will

address only that method.  *See Morgan*, 724 F.3d at 997 ("[I]f a plaintiff eschews

burden-shifting and presents direct and circumstantial evidence in opposition to an

employer's motion for summary judgment, the court can look at that.").

Retaliation is established under the direct method if the plaintiff can show:  "(1)

she engaged in protected activity; (2) she suffered an adverse employment action; and

(3) a causal connection exists between the two."  *Rozumalski v. W.F. Baird & Assocs.,*

*Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019).  Put differently, Chatonda can establish

causation by "showing that [her] complaints and EEO filings were a substantial or

motivating favor in [the Board's] decisions to" take the alleged adverse action against

her.  *Coleman*, 667 F.3d at 860.  Direct evidence of such motivation "would entail

something akin to an admission by the employer ('I'm firing you because you have the

nerve to accuse me of sex discrimination!')."  *Id.*  Because such evidence is typically not

available, the Seventh Circuit has recognized three categories of circumstantial

evidence that permit an inference that an employee's protected activity was a

substantial or motivating factor for the employer's adverse action.  These are:  (1)

evidence of "suspicious timing, ambiguous statements oral or written, . . . and other bits

and pieces from which an inference of [retaliatory] intent might be drawn"; (2) "evidence,

but not necessarily rigorous statistical evidence, that similarly situated employees were

treated differently"; and (3) "evidence that the employer offered a pretextual reason for

an adverse employment action."  *Id.* (citation and quotation marks omitted).

The Board contends that Chatonda cannot establish a causal connection

18

between her filing of an EEOC charge in 2007 and her designation as DNH in 2010. *See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 8. Specifically, the Board argues that it had a legitimate, non-retaliatory reason for designating Chatonda as DNH: she was found to have engaged in irremediable conduct and, based on internal guidelines, was determined to be ineligible for rehire. According to general counsel Ciesil, who sent the email to the Board's HR department regarding Chatonda's DNH designation, he "followed this practice for all employees" who were "dismissed for cause, including, but not limited to, employees who engaged in misconduct" and "employees who separated from employment while an investigation was pending if that investigation substantiated misconduct." Ciesil Decl. ¶¶ 6, 8. The Board further contends that the gap in time between Chatonda's EEOC filing and her placement on the DNH list is too long to permit an inference that the two events are related. Finally, the Board argues that Chatonda's EEOC filing made allegations against a different school from the one from which she was terminated in 2010 (which led to her DNH designation) and that this disconnect further undermines an inference that her status as DNH is causally related to her 2007 EEOC charge.

As laid out in her complaint, Chatonda alleges that the Board retaliated against her by "plac[ing] her in the DNH designation without notice" after she "filed a charge of discrimination with the EEOC." Second Am. Compl. ¶¶ 38–39. In response to the Board's motion for summary judgment, however, Chatonda appears to contend that the retaliatory actions were her transfer to a different school and that, while at this new school, the principal called the police to investigate whether or not Chatonda pinched a student. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7. The Court will not credit this

19

argument in her brief, however, because "[a] plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Gibbs v. Gen. Motors Corp.*, 104 F. App'x 580, 583 (7th Cir. 2004). Therefore, the Court will confine its discussion to the claimed connection between Chatonda's EEOC filing in 2007 and her DNH designation in 2010.

No reasonable jury could find a causal nexus between Chatonda's EEOC filing and the DNH designation. First, the Board has put forth evidence that it applied a neutral, automatic policy when designating Chatonda as DNH following her termination. Chatonda contends that a genuine factual dispute exists over whether her DNH designation was due to her termination for cause, as the Board contends, or instead was based on retaliatory animus. She argues that Ciesil "could not definitively say that the DNH designations were applied automatically." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 8. Chatonda further argues that Ciesil's deposition testimony is undermined by a chart created by the Board. This chart "consists of a list of teachers terminated from 2009 to 2011 for at least one of the violations for which [Chatonda] was terminated." *Id.* at 8. But according to Chatonda, "[t]he chart actually includes a teacher that was *not* designated as DNH[,] without explanation." *Id.* Chatonda is correct that this chart indicates that one of the thirteen terminated teachers listed was not designated as DNH. *See* Def.'s SOF, Ex. 57. Thus, Chatonda contends, the Board's "own chart belies the assertion that the DNH designation was applied automatically" and therefore "there is a clear dispute of fact as to [the Board's] asserted legitimate, non-discriminatory reason for designating [her] as DNH." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 8–9.

20

The Court is not persuaded that this chart can bear the weight Chatonda seeks to put on it.  First, the chart itself contains limited information—as Chatonda herself points out, there is no explanation of why each teacher was (or in the single instance, was not) designated DNH.  Ciesil stated during his deposition that "[i]f the individual was actually terminated by the Board for cause, that would be a reason why we would put a Do Not Hire on their file.  Also, if an individual resigned in lieu of a termination hearing, we would also place a Do Not Hire on their file."  Def.'s SOF, Ex. 7 at 17:20–24 (Ciesil deposition transcript).  Ciesil was later asked the following question:  "[W]hat factors would you consider when you were recommending a Do Not Hire designation?"  *Id.*, Ex. 7 at 22:24–25.  Ciesil responded:  "If the individual resigned or was terminated for cause they would get a—I would recommend a DNH."  *Id.*, Ex. 7 at 23:1–2.  Ciesil was then asked:  "And are you aware of any times where a teacher was terminated, but was not designated a Do Not Hire?"  *Id.*, Ex. 7 at 23:3–4.  And he gave the following response: "I cannot really think of any case that that was not the situation."  *Id.*, Ex. 7 at 23:5–6. When pressed on his answer, Ciesil further stated:  "Every case that I handled involving resignation or termination of an individual for cause, I always recommended the DNH." *Id.*, Ex. 7 at 23:9–10.  Ciesil was later asked:  "And so you said that you recommend Do Not Hire designations in all of your cases.  Why is that?"  Def.'s SOF, Ex. 7 at 24:12–13. Ciesil responded:  "That was basically the internal policy that anybody who was— substantiated an investigation where they either were resigning in lieu of termination charges or actually being terminated by the Board, there would be a recommendation for DNH."  *Id.*, Ex. 7 at 24:14–18.

Chatonda points to no contrary testimony.  And the Court is not persuaded that

Ciesil's testimony actually conflicts with the chart's reference to one terminated teacher who was not designated DNH such that there exists a genuine factual dispute regarding the automaticness of the DNH designation for teachers terminated for cause. In particular, the chart does not indicate whether the teacher not designated DNH was terminated for cause or resigned in lieu of a termination hearing, which is when Ciesil said a DNH designation would be applied. In sum, Chatonda has not put forth evidence that a reasonable finder of fact could rely on to infer that the Board's decision to designate her as DNH deviated from its policy or that the policy was anything other than automatic for teachers who, like Chatonda, were terminated for cause.

Further, an EEOC filing in 2007 is too temporally removed from a DNH designation in 2010 to reasonably infer—without more—that the designation was caused by the filing (i.e., that it was retaliatory). And Chatonda points to no other evidence that would permit a reasonable jury to find a causal connection between the EEOC filing and the DNH designation. *See Anderson v. Donahoe*, 699 F.3d 989, 996 (7th Cir. 2012) (finding that a thirteen-month period between the plaintiff's protected activity and the adverse action, "without more, does not create a genuine issue of fact on the inference of retaliation"); *Lavite v. Dunstan*, 932 F.3d 1020, 1032 (7th Cir. 2019) (finding that a "two-year gap between the critical events," coupled with a "lack of other causation evidence . . . helps show that summary judgment was proper").

Chatonda also contends that she can show retaliation under a "cat's paw" theory. "With sufficient evidence, [courts] permit juries to draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision."

22

*Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011). Chatonda contends that "her termination arose out of accusations made against her in retaliation for filing an age-based claim of discrimination." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 9. She further argues that "[e]ven if there is no direct evidence of discrimination supporting the conclusion that the decisionmakers had discriminatory motive in this case, there is evidence of discrimination by [Chatonda's] colleagues when they retaliated against her after filing her claim of discrimination." *Id.*

This argument is not persuasive. There is no evidence in the record that would permit a reasonable fact-finder to infer that the Board's decision to designate Chatonda as DNH was somehow infected by impermissible bias from Lorraine Wilson, the principal of James Madison Elementary, and Dr. Eason Watkins, the Area Coach. These were the two individuals against whom Chatonda leveled her EEOC charge. But she points to no evidence that they had anything to do with the DNH designation process; her vague statements that colleagues retaliated against her in response to her 2007 EEOC filing is insufficient. Without a showing of influence over the decision-making process—which is missing here—the cat's paw theory fails.

For these reasons, the Board is entitled to summary judgment on count 3.

## B.     Occupational liberty under section 1983 (Count 1)

Chatonda contends that the Board deprived her of her "liberty interest in the pursuit of her occupation as a teacher without due process." Second Am. Compl. ¶ 26. According to Chatonda, the Board's designation of her as DNH "stigmatized and prevented [her] from all teaching jobs after her termination" and "deprived [her] of her right to equal employment opportunities within the teaching profession on the basis of

her race." *Id.* ¶¶ 27–28.

Section 1983 creates a remedy for individuals deprived of their constitutional rights by any person acting under color of state law. In the present action, Chatonda alleges that the Board violated her rights under the Fourteenth Amendment's Due Process Clause, which prohibits a state from depriving persons of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Chatonda contends that the Board infringed on her liberty—specifically her "occupational liberty— the liberty to follow a trade, profession, or other calling." *Biggs v. Chi. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023) (citation and quotation marks omitted). To prevail on this claim, Chatonda must show "that (1) the defendant made stigmatizing comments about her; (2) those comments were publicly disclosed; and (3) she suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Id.* at 560 (cleaned up).

The Seventh Circuit has emphasized that "[a]n occupational liberty plaintiff faces a high hurdle to show that she has suffered a tangible loss of employment opportunities from a defendant's public stigmatizing statements." *Id.* "Mere frustration or delay in getting a new job will not suffice"; to succeed on her occupational liberty claim, Chatonda must show that her designation as DNH "made it *virtually impossible* for her to find new employment within her occupation." *Id.* (citations and quotation marks omitted); *see also Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (stating that an occupational liberty claim requires showing that the defendant's publicly stigmatizing statement "had the effect of blacklisting the employee from employment in comparable jobs").

24

The Board contends that it is entitled to summary judgment in its favor on count 1 because Chatonda fails to establish any of the requirements enumerated in *Biggs*. First, the Board argues that Chatonda was not stigmatized by the Board designating her as DNH. Next, the Board contends that Chatonda cannot establish that it publicly disclosed any stigmatizing comments. Finally, the Board argues that Chatonda has not experienced a tangible loss of employment opportunities and that undisputed facts show that she has retained work as an educator since her designation as DNH.

The Court concludes that the Board is entitled to summary judgment on count 1. First, Chatonda cannot establish that the Board ever publicly disclosed her DNH designation as the Seventh Circuit reads this requirement. Chatonda contends that the Board impermissibly disclosed her DNH designation to the public on three occasions: once in 2010, in a letter from James Ciesil, general counsel for the Board, to the Illinois State Board of Education; again in 2021, which Chatonda alleges resulted in her being "barred from grant writing at the Defendant's schools because of her DNH designation"; and finally on or before 2022, to personnel at a Chicago public school that Chatonda's grandson attended. *See* Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 17–18.

The disclosures noted by Chatonda are insufficient to sustain her occupational liberty claim because they were not public. "A public stigmatizing statement is one that is distributed in a manner which would reach future potential employers of the plaintiff or the community at large." *Biggs*, 82 F.4th at 562 (citation and quotation marks omitted). But a DNH designation is internal to CPS, and therefore "it does not qualify." *Id.*; *see also* Def.'s SOF ¶ 17 ("The Board's DNH designation is an internal designation."). Chatonda does not point to any evidence that would permit a reasonable jury to find that

her DNH designation was anything other than internal to CPS. And although Chatonda contends that other teachers and parents were present when she was told she could not enter a Chicago public school in 2022 due to her DNH designation, she cites no evidence that would permit a finding that this allegedly public disclosure was distributed in a manner that would reach future employers or her community at large. One isolated incident, observed by an unknown number of onlookers, does not suffice. No reasonable fact-finder could find otherwise.

Even if the Court is incorrect regarding the claimed public disclosure of Chatonda's DNH designation, it agrees with the Board that Chatonda did not experience a tangible loss of employment due to any stigmatizing statement by the Board.[5] Most notably, Chatonda secured two classroom teaching positions during the 2013–2014 and 2015–2016 school years. *See* Pl.'s Resp. to Def.'s SOF ¶¶ 49, 51. During the 2013–2014 school year, she worked as a full-time first grade teacher at McNeal Elementary in Canton, Mississippi; during the 2014–2015 school year, she worked as a full-time sixth through eighth grade science teacher for St. John De LaSalle High School, a private Catholic high school in Chicago. *Id.*

The Board also points to other positions that Chatonda held following her termination and designation as DNH in 2010, but these are better categorized as simply in the "field of education" but not aligned with Chatonda's specific "occupation" of teaching. *See Biggs*, 82 F.4th at 560–62 ("[D]etermining a plaintiff's 'occupation,' as

---

[5] In its Statement of Facts, the Board asserts that "Chatonda has no evidence or firsthand knowledge that she was denied employment at or terminated from employment at any company or educational institution due to the fact that she has a DNH designation with the Board." Def.'s SOF ¶ 58. Chatonda "admits" to this fact. Pl.'s Resp. to Def.'s SOF ¶ 58. The Court does not base its findings on this admission.

distinguished from a specific job or field, requires a case-specific inquiry and a healthy dose of common sense.  An occupation entails the performance of a discrete set of professional responsibilities that can be meaningfully distinguished from those of other occupations in a field.").  Still, the two positions that Chatonda obtained, as noted in the previous paragraph, are sufficient to establish that no reasonable jury could find that it was "virtually impossible for [Chatonda] to find work as a [teacher]." *Id.* at 563.  This entitles the Board to summary judgment on count 1.  And although Chatonda contends that she has suffered a tangible loss of employment because she has had to take lower paying jobs and apply outside of Illinois, this is insufficient to establish an occupational liberty claim.  *See Martin v. Haling*, 94 F.4th 667, 672–73 (7th Cir. 2024) ("[R]educed economic returns and diminished prestige are insufficient to establish an occupational liberty deprivation absent permanent exclusion from or protracted interruption of employment." (citation and quotation marks omitted)).

For these reasons, the Court grants summary judgment in favor of the Board on count 1 of Chatonda's second amended complaint.

### Conclusion

For the reasons stated above, the Court grants the Board's motion for summary judgment on all claims against it [dkt. 71].  The Clerk is directed to enter judgment stating:  This case is dismissed with prejudice.

MATTHEW F. KENNELLY
United States District Judge

Date:  August 25, 2025

27